UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X
                                                        :
XIAMIN ZENG a/k/a AIMEE ZANE,                           :
                                                        :        **ORDER AND OPINION**
                                          Plaintiff,    :        **GRANTING MOTION FOR**
                                                        :        **SUMMARY JUDGMENT**
              -against-                                 :
                                                        :
NEW YORK CITY HOUSING AUTHORITY,                        :          18 Civ. 12008 (AKH)
                                                        :
                                          Defendant.    :
                                                        :
------------------------------------------------------- X

ALVIN K. HELLERSTEIN, U.S.D.J.:

       Plaintiff Xiamin Zeng a/k/a Aimee Zane ("Plaintiff") brought this action under

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Counts I–III), the New York

City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.* (Counts IV–VI),

and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 (Counts VII–IX), alleging

that her employer Defendant New York City Housing Authority ("NYCHA" or "Defendant")

engaged in unlawful discriminatory and retaliatory practices.  In particular, Plaintiff alleges that

NYCHA subjected her to a hostile work environment and discriminated against her because of

her race, gender, and status as a victim of domestic abuse.  She further alleges that Defendant

terminated her as retaliation for reporting said discriminatory treatment.  Defendant now moves

for summary judgment on all counts, *see* ECF No. 50, denying that it discriminated against her in

any way, that they took appropriate actions when Plaintiff complained, and that they ultimately

terminated her because of her poor performance and insubordination, a legitimate non-

discriminatory and non-retaliatory reason.

       I agree with Defendant.  There are no material issues of fact, and, for the reasons

described below, I grant Defendant's motion and give judgment to Defendant.

## BACKGROUND

Plaintiff is a Chinese-American woman, single mother, and survivor of domestic abuse.  Defendant's Rule 56.1 Statement of Material Facts ("SMF") ¶ 2, ECF No. 53-1.[1]  She worked for Defendant, as a probationary Caretaker J, performing janitorial services, from July 28, 2016 until May 12, 2017.  ¶ 3.  During her employment tenure, Plaintiff worked at three different NYCHA developments under three different supervisory teams.  She claims that she suffered discriminatory treatment at each—up to and including her termination.

Plaintiff started working for Defendant at La Guardia Houses, 300 Cherry Street, on July 28, 2016, where she reported to Supervisor of Caretakers Alexander Rodriguez ("Rodriguez") and Superintendent Paula Davenport ("Davenport").  ¶ 13.  Although not the only female employee, Plaintiff was the only employee of Asian descent at 300 Cherry Street.

Although Plaintiff's first months at La Guardia Houses were unremarkable, including an evaluation in September 2016 that listed her performance as satisfactory, *see* ECF No. 57-3, the good times were not to last.  On September 28, 2016, a man (who may have been a resident) exposed his genitals to Plaintiff while she was working in the compactor room at 300 Cherry Street.  ¶ 16.  Defendant immediately offered to transfer Plaintiff to another location, but Plaintiff declined; nevertheless, Defendant reassigned her to 45 Rutgers Street (another building within La Guardia Houses).  ¶¶ 18–19.

Plaintiff claims that she suffered race- and gender-based discrimination at La Guardia Houses.  First, she claims that she was discriminated against because she was forced to work alone in a building that was "known to be dangerous."  As to the "known" danger, Plaintiff

---

[1] Unless otherwise noted, paragraph symbols ("¶") refer to paragraphs in Defendants' Statement of Undisputed Facts, Dkt. No. 53-1, and corresponding paragraphs in Plaintiff's Opposition Statement, Dkt. No. 57-1.  Unless otherwise notes, the stated facts are not disputed by the parties.

offers no evidence; instead, she generally avers that La Guardia Houses were dangerous and that she heard this from supervisors and coworkers.  ¶ 69–71; Plaintiff's Deposition ("Pl. Depo.") 46:15–17, ECF No. 53-33.  Plaintiff also claims that in dangerous buildings, such as 300 Cherry Street, caretakers worked in pairs; however, Rodriguez testified that caretakers at La Guardia Houses ordinarily work alone, and that they initially are assigned to work alongside another caretaker only temporarily, until they become familiarized with the building and janitorial schedule, and that this acclimation period generally lasts no longer than a month.  Alexander Rodriguez Deposition ("Rodriguez Depo.") 21:4–7, ECF No. 53-35; *id.* 22:8–11.

Second, Plaintiff claims that she was discriminated against because she was not provided a winter coat and forced to work long hours in the winter without such a coat.  ¶ 79.  Apparently, sometime in September 2016, Ms. Shavell, who worked in the storage room, asked all of Plaintiff's non-Asian co-workers for their coat size, so that Defendant could provide them with winter coats, which all but Plaintiff received sometime in October.  ¶ 77–78.  Plaintiff maintains that she reported this sleight to Davenport, but that Davenport failed to respond.  ¶ 78.  Plaintiff followed up with Ms. Shavell, who allegedly informed Plaintiff that she did not receive a winter coat because Davenport told Shavell not to order her one.  ¶ 78.  Plaintiff was questioned about this incident in her deposition and asked why she felt it necessary to identify Davenport as "black" in her Complaint.  Plaintiff averred that Davenport's race was mentioned because Davenport "discriminated against [Plaintiff], against [her] race."  Pl. Depo. 72:24–25.

Third, Plaintiff claims that she was forced to work longer than her coworkers, but the timesheets in the record do not corroborate this assertion, and instead, reflect that Plaintiff consistently worked the same hours.  ECF No. 62-1 ¶¶ 6–14.

Finally, Plaintiff claims that she suffered discrimination because she was twice denied requests for time off to attend court hearings. During her tenure at La Guardia Houses, however, Plaintiff requested, and Defendant approved, at least eight different requests for time off to attend court hearings, meet with her lawyer, or meet with her social worker. ¶¶ 14–15. There is no record of any denials.

Plaintiff claims that she requested time off on October 15, 2016, but that Rodriguez and Davenport threatened that if she took time off, she would fail her probationary period and be terminated. ¶ 81. Thus, on this occasion, Plaintiff seems to suggest that she was dissuaded from making the necessary request, and so no record of a "denial" exists.

Plaintiff also claims that she was denied time off on November 2, 2016. The record shows that Defendant, in fact, approved a request on that date. Plaintiff maintains, however, that she had a second request, which was not approved. In her deposition, Plaintiff testified that Rodriguez refused to give her a form to fill out, and therefore, she was unable to submit this second request. ¶ 84. She also claims that when she made the request, presumably verbally, Rodriguez said, "fuck your child" and "fuck your son." ¶ 84. In his deposition, however, Rodriguez testified that leave of absence forms were available in his office, and more importantly, that if an employee sought leave to attend a court hearing, he was not able to deny such a request. Rodriguez Depo. 41:17–19; 55:3–6. Rodriguez also denied cursing at Plaintiff and stated that he does not use such language. *Id.* 46:21; 48:3. Plaintiff has not offered any explanation as to why she was unable to obtain a second form on November 2, or why if there were two requests, she was unable to submit both on the single form containing the request that was approved on November 2.

Plaintiff's tenure at La Guardia Houses ended November 22, 2016. Plaintiff

requested a transfer after she again saw the man who exposed his genitals to her, this time outside Rutgers Street.  ¶ 20.  In her request, Plaintiff stated that "Vladeck House[s] is a better choice;" however, NYCHA transferred her to Isaacs Houses.  ¶ 21–22.

Plaintiff began working at Isaacs Houses on November 23, 2016, where she reported to Supervisor of Caretakers Elliot Ramos ("Ramos") and Superintendent Russell Hartfield ("Hartfield").  ¶ 24.  Unlike her initial days at La Guardia Houses, Plaintiff's tenure at Isaacs Houses was seemingly difficult from the outset, both in terms of the discriminatory treatment that Plaintiff alleges she suffered and her ability to perform her work to the satisfaction of her supervisors.

Plaintiff claims that her supervisors and co-workers made racist and derogatory comments to her.  For example, on December 23, 2016, in the dining hall, after Plaintiff said that she could not work Christmas because she had to orchestrate visitation with her son's father, Plaintiff's co-workers, "Ms. Schuler," "Ms. Powell," "Ms. McKnight," and "Ms Slim," and Ramos laughed and began shouting racist and sexist comments at her such as "fucking Asian," "fucking yellow Asian," "fucking stupid bitch," and "fuck her son."  ¶ 96.  Ramos allegedly also openly questioned her status as a survivor of domestic abuse and demanded proof of her status and her obligation to facilitate the visitation or face termination.  ¶ 97.  Further, Plaintiff maintains that on multiple occasions, Ramos kicked open the unlockable women's bathroom door, walked in on Plaintiff using the bathroom, and asked if she was sleeping or taking a break. ¶ 90.

Plaintiff also claims that she was treated worse than her non-Asian coworkers. For example, Plaintiff alleged in her Complaint that she was never issued a physical schedule of her duties.  ¶ 88.  In her deposition, however, Plaintiff conceded that she did receive one;

however, she testified that she received it on her last day working at Isaacs Houses.  Plaintiff also

claims that she was forced to work longer hours than her co-workers and forced to help them

with their work, and at least one occasion to do Ramos's work—counting the number of air

conditioning units.  ¶ 89.  (Although Plaintiff's Complaint characterizes these assignments as

punitive, in her deposition, Plaintiff offered them as proof that her work was not subpar.)

Finally, Plaintiff again claims that she was denied leave to attend court hearings.

Although the record shows that Defendant approved at least three requests for leave, Plaintiff

maintains that she had other requests to attend court hearings, sometime between the end of 2016

and January of 2017, that were denied by her supervisors.  Pl. Depo. 95:7–9.  Again, there is no

record evidence of such denials, but Plaintiff testified that she was not given Leave of Absence

forms, which precluded her from making a request and resulted in an effective denial.  Plaintiff

testified that she missed court hearings but has offered no corroborating evidence.

Plaintiff claims that she reported this mistreatment to a number of people.  ¶ 95.

First, she claims that she verbally reported the discrimination to Hartfield, but that he failed to

report or investigate her allegations.  ¶ 98.  Second, she contacted Safe Horizons, an organization

that aids victims of domestic violence, and her local councilperson.  ¶¶ 99–100.  Third, she

claims that she called Human Resources ("HR") in December 2016 and January 2017.  ¶ 100–01.

No record exists of the calls to HR, however, and Deborah Altman ("Altman"), Assistant

Director of Human Resources, testified that she was unaware of any such complaints prior to

March 2017 when Plaintiff reported them directly to her.  Deborah Altman Deposition ("Altman

Depo."), 25:22–23; 29:8–14, ECF No. 53-34.  Altman further noted that HR is small, so even

assuming that Plaintiff had made such calls, perhaps at a time when Altman was out of the

office, it was unlikely that Altman would not have heard of the complaints.  *Id.* 30:12–21.

Notwithstanding Plaintiff's initial satisfactory evaluation in September at La Guardia Houses, Plaintiff's performance at Isaacs Houses was less than satisfactory, as evidenced by three counseling memoranda and second probationary evaluation.  On December 21, 2016, Ramos issued Plaintiff her first counseling memo for failing to properly store her keys.  ECF No. 53-14.  Ramos issued the memo after Plaintiff reported having lost them.  ¶ 92.  She apparently found her keys thirty minutes later and asked Ramos to withdraw the memo.  ¶ 92.  He refused to do so, which Plaintiff claims Ramos did for other non-Asian employees.  ¶ 92.

On December 28, 2016, Ramos issued a second counseling memo which stated that he found the stairs not cleaned, and that despite his instructions on December 23, 2016, Plaintiff had failed to clean the elevator cab prior to applying lemon oil.  The memo also stated that Ramos checked Plaintiff's slop sink and found the room had a heavy odor of urine and a dirty mop head in the sink.  ECF No. 53-14.

That same day, Ramos and Hartfield gave Plaintiff an evaluation, which stated that Plaintiff was often away from her work area, accomplished little work, had to be checked on frequently, argued with supervisors and staff, needed instructions often, and rarely understood assignments.  ECF No. 53-15.

Finally, on December 30, Ramos issued a third counseling memo, which stated that Plaintiff failed to respond when Ramos called her via the housing radio, and further noted that Plaintiff was responsible for answering any radio communication from supervisors or coworkers.  ECF No. 53-14.  The memo also indicated that Hartfield and Ramos observed Plaintiff in the slop sink, and that they had advised her that the slop sink is not a place to hang out or take unauthorized breaks.  *Id.*

Although Plaintiff does not dispute that the counseling memoranda were issued,

she contests that they were warranted by her behavior.  As a seeming sign of protest, Plaintiff

refused to sign her name and acknowledge receipt.  Plaintiff also claims that Ramos "tried to find

ways" to issue her a memo, including that he issued her a memo for taking an "unapproved" day

off to attend a court hearing.  *See* Complaint ¶¶ 55–59, ECF No. 1.  There is no evidence,

however, of such a memo.

Plaintiff's tenure at Isaacs Houses ended on January 9, 2017, again because

Plaintiff sought a transfer, this time because Plaintiff's abusive ex-boyfriend had learned where

she worked, and Plaintiff feared for her safety.  ¶ 30.  In her deposition, Plaintiff testified that the

real reason she sought a transfer was due to the discriminatory treatment she suffered, though she

acknowledged that her transfer request included no such reference.  Pl. Depo. 110:12–22;

111:15–19.  Defendant nevertheless immediately was transferred to Smith Houses to

accommodate her status as a survivor of domestic abuse and to ensure her continued safety.

¶ 31.

Plaintiff began working at Smith Houses on January 10, 2017, where she reported

to Supervisor of Caretakers William Burkett ("Burkett") and Superintendent Elliot Medina;

Liliana Billini ("Billini") was the Property Manager.  ¶ 32, 33, 36.

Plaintiff claims the discriminatory treatment continued at Smith Houses.  Plaintiff

claims that, on her first day, Medina asked Plaintiff to come to the management office where she

overheard Medina call Ramos to request Plaintiff's personnel files.  Plaintiff claims that Ramos

got very angry and yelled, "Fuck the Bitch!  Do not transfer her!  I'm her boss.  She must be [at

Isaacs Houses]!  Giver her a memo.  Kick her out.  Stupid Yellow Bitch!"  Plaintiff maintains

that Medina, Williams, and another Ground Supervisor were present but said nothing, and when

the call ended, the supervisors went into a room and talked privately, then asked Plaintiff about

the incidents at La Guardia and Isaacs Houses.  ¶¶ 104–05.  Plaintiff claims that she shared the discrimination she faced at Isaacs Houses and further complained about Ramos's comments on the phone and his intention to terminate her without reason, but that her supervisors took no action.  *Id.* ¶¶ 104–05.  In his deposition, Medina denied that any of the foregoing events occurred.  Elliot Medina Deposition (Medina Depo.) 22:11; 22:22–23, ECF No. 58-2.

That same day, Plaintiff also claims that she was forced to work long hours outside in the cold and wet weather.  ¶ 106.  She claims that this caused her to become sick, but that Defendant denied her request for leave to see a doctor and instead forced her to continue working while sick.  ¶ 106.  She also claims that at one point, Burkett denied her request for leave to see her attorney, instead telling Plaintiff that she had to report to work.  ¶ 108.  There is no evidence of either denial in the record.

Plaintiff further claims that suffered racial discrimination at the hands of her co-workers and Medina.  First, she claims that Ms. Slim from Isaacs Houses was reassigned to Smith Houses, and that she cursed and laughed at Plaintiff, saying "Fuck Asians."  ¶ 107.  Second, she cites an email from Medina to Billini, forwarding Plaintiff's message that she would be out with "period pains" on January 31 and February 1, 2017.  Medina's email stated, "Look at this Billini! It Chinese new year. Ivy [in the billing department] pay dock her."  ¶ 111.  In his deposition, Medina did not dispute the contents of the email and explained that Plaintiff had not followed the appropriate procedures to request time off.  Medina Depo. 27:6–7.  His testimony suggests that he did not believe that Plaintiff had menstrual cramps and instead wanted the days off due to the Chinese Holiday.  *Id.* 29:24–30:1.  According to Medina, he was simply alerting his boss that it was, in fact, a holiday, and that Plaintiff was not entitled to paid time off.

As the discriminatory treatment allegedly persisted, so did Plaintiff's poor

performance, again documented in a series of counseling memoranda.  First, on January 26,

2017, Burkett issued Plaintiff a counseling memo for failing to complete her janitorial schedule;

the memo stated that Burkett inspected Plaintiff's assigned building and found excessive debris

on the walkways and grass, and the elevators had dry spills indicating they had not been mopped.

ECF No. 53-18.

Second, on February 3, 2017, Medina issued Plaintiff a counseling memo for

insubordination; the memo stated that on February 2, 2017, Burkett accompanied Plaintiff to

Medina's office after she had refused to complete her work assignment of cleaning the exterior

areas of the development.  *Id.*  When asked why she refused, Plaintiff stated that she did not have

to complete the assignment, that she would be transferred out of Smith Houses soon, and that she

would call her lawyer.  *Id.*  Apparently, Medina explained that HR does not manage day-to-day

operations, and that when asked if she would complete her work, Plaintiff said "no."  Plaintiff's

work assignment had not been completed an hour later.  *Id.*

Finally, on February 6, 2017, Billini issued Plaintiff a counseling memo for

insubordination that states that on February 6, 2017, in front of Billini and others, Plaintiff told

Burkett she would not complete her assigned work and would only sweep and mop.  ECF No.

53-18.  Plaintiff told her supervisor to call Human Resources, stating that the Director told her

she did not have to do the work; Plaintiff also threatened to call her lawyer.  *Id.*  After two hours,

Plaintiff had not completed her assigned work.  *Id.*  That same day, Billini emailed her boss,

requesting Plaintiff's immediate termination—she cited Plaintiff's insubordination, including her

refusal to complete tasks and follow the instructions of her supervisors, and further noted that

Plaintiff's insubordination was not only affecting staff morale at Smith Houses, but also creating

a disservice to the residents.  ¶¶ 63–64.

10

Seemingly unbeknownst to Billini, however, Plaintiff had requested a transfer to another development the previous week.  On January 27, Plaintiff e-mailed Altman requesting time off on January 27 and January 30 due to an "urgent domestic violence issue."  ¶ 37.  She also requested to be transferred to a development closer to her home.  *Id.* ¶ 38.  Altman granted the leave request but told Plaintiff that she should follow up regarding the transfer.  ¶ 39. Plaintiff emailed HR again on February 3, this time requesting an emergency transfer to Vladeck Houses because of her "urgent domestic violence issues"—she "believe[d] her ex-partner" knew where she was working and was "so scared" because "he threatens to kill" her.  ¶ 40.  Altman met with Plaintiff on February 6 to discuss the transfer request and told Plaintiff that she could stay home until a transfer was identified.  ¶¶ 41–42.

Notwithstanding Billini's recommendation for termination, Altman continued trying to effectuate a transfer.  Although Plaintiff continued requesting a transfer to Vladeck Houses, Altman asked whether Plaintiff would accept assignment at another NYCHA location, explaining that NYCHA could not transfer her to a preferred location without some justification as to why such assignment was necessary to keep Plaintiff safe from her abuser.  ¶ 44–47. Plaintiff responded that Vladeck Houses is a safe project, and that she did not want to go to a project with a high crime rate or be in danger at work; she provided no documentation corroborating a specific need to be transferred to Vladeck Houses.  *Id.* ¶ 48–49.

On March 6, 2017, Altman met with Plaintiff and offered to transfer Plaintiff to the only available Caretaker J position in Manhattan, at Rutgers Houses, which is located a few blocks from Vladeck Houses.  *Id.*  ¶¶ 51–53.  Plaintiff rejected Rutgers Houses because of its proximity to La Guardia Houses, even though Vladeck Houses is equally as close.  *Id.* ¶ 55. Altman also offered Plaintiff placements in the Bronx and Staten Island; Plaintiff rejected these

too without explanation.  *Id.* ¶ 57.

     During the March 6 meeting, Plaintiff also told Altman that she had been discriminated against based on her race at prior NYCHA developments.  ¶ 58.  Altman advised Plaintiff that she should report the incidents to NYCHA's Department of Equal Opportunity ("DEO"), and Altman also relayed Plaintiff's complaints to the DEO, noting that this was the first Altman had heard of such complaints.  ¶ 60.  Thereafter, DEO Investigator Igor Shandler ("Shandler") made multiple attempts to contact Plaintiff concerning her allegations—calling her on March 8 and March 15, 2017, and sending letters on March 8, 15, and 30, 2017.  *Id.* ¶ 61.  On March 28, Plaintiff emailed Shandler stating that she had been discriminated against because of her race and that she had been sexually threatened at LaGuardia Houses when a man exposed his genitals to her.  ¶ 62.

     Defendant received no additional communications from Plaintiff and no explanation as to why the transfer to Rutgers Houses or the Bronx or Staten Island developments were unacceptable accommodations.  Defendant terminated Plaintiff on May 12, 2017, relying upon the six counseling memoranda that documented her poor performance and insubordination.

     Plaintiff brought suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Counts I–III), the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.* (Counts IV–VI), and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 (Counts VII–IX).  Defendant moves for summary judgment on all counts.

## DISCUSSION

### I.    Legal Standard

     Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a);

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court must "view the evidence in the light most favorable to the party opposing summary judgment[,] . . . draw all reasonable infereces in favor of that party, and . . . eschew credibility assessments." *Amnesty Am. V. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004).  However, the nonmovant may not rely on conclusory allegations or unsubstantiated speculation to defeat the summary judgment motion. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).

"In assessing the inferences that may be drawn from the circumstances surrounding a termination of employment, the court must be alert to the fact that [e]mployers are rarely so cooperative as to include a notation in the personnel file that their actions are motivated by factors expressly forbidden by law." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (internal quotation marks omitted). "[C]aution must be exercised in granting summary judgment where intent is genuinely in issue . . . ." *Id.* at 40.  The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).  "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Id.*

### A. Wrongful Termination Claims under Title VII and Section 1981

#### 1. Legal Standard

Plaintiff's claims under Title VII and Section 1981 "are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."

*Simmons v. Akin Gump Strauss Hauer & Feld, LLP*, 508 Fed. App'x 10, 12 (2d Cir. 2013).

"Under the *McDonnell Douglas* framework, [Plaintiff is] required to make out a prima facie case

of discrimination by showing: (1) membership in a protected class, (2) satisfactory job

performance, (3) adverse employment action, and (4) circumstances giving rise to an inference

of discrimination on the basis of her membership in that class." *Id.*

If a plaintiff establishes a prima facie case, a presumption of discrimination is

created and the burden of production shifts to the defendant to articulate some legitimate,

nondiscriminatory reason for the adverse employment action or termination. *See McDonnell*

*Douglas*, 411 U.S. at 802–03. "If the defendant bears its burden of production, the presumption

drops out of the analysis and the defendant will be entitled to summary judgment ... unless the

plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination."

*Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir. 2001) (internal citations and quotation

marks omitted). To do so, Plaintiff must produce "not simply some evidence, but sufficient

evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by

the employer were false, and that more likely than not discrimination was the real reason" for the

challenged actions. *Van Zant v. KIM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir.1996)

(internal quotation marks omitted).

"In assessing the inferences that may be drawn from the circumstances

surrounding a termination of employment, the court must be alert to the fact that [e]mployers are

rarely so cooperative as to include a notation in the personnel file that their actions are motivated

by factors expressly forbidden by law." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37

(2d Cir. 1994) (internal quotation marks omitted). "[C]aution must be exercised in granting

summary judgment where intent is genuinely in issue . . . ." *Id.* at 40. The Second Circuit has

"repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Id.*

### 2. Application

Defendant has adequately rebutted Plaintiff's prima facie case (if any) of race- or gender-based discrimination by articulating a legitimate non-discriminatory reason for its business decision—Plaintiff's poor performance and insubordination—and I hold that Plaintiff has not produced evidence to support a rational finding that "the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not discrimination was the real reason" for the challenged actions. *Van Zant*, 80 F.3d at 714.

As evidence of pretext, Plaintiff first points to her initial probationary review dated September 28, 2016, which rated her performance as "satisfactory." She cites her own testimony that the six counseling memoranda were unwarranted, and that it was not possible that she was terminated for poor performance because her supervisor forced her to do her co-workers' duties. Pl. Depo. 151:9-152:7. She further speculates that her supervisors fabricated bases for subjecting her to discipline. Her allegations are conclusory, and the evidence to support the claims does not raise a prima facile case.

To begin, "courts in this Circuit have found that a change in performance reviews, without more, does not lead to an inference of discriminatory motive." *Johnson v. N.Y.C. Dep't of Educ.*, No. 10-CV-2604, 2014 U.S. Dist. LEXIS 119158, at *9 (E.D.N.Y. Aug. 19, 2014). "In fact, such an inference is even less permissible when a new supervisor is appointed, who is

entitled to set his own standards and agenda." *Gambello v. Time Warner Communs., Inc.*, 186 F. Supp. 2d 209, 222 (E.D.N.Y. 2002) (internal quotations and citation omitted). "The mere fact that Plaintiff had a better relationship with or received better evaluations from previous supervisors does not, on its own, raise an inference of discrimination." *Davis v. Oyster Bay-E.*, No. 03-CV-1372, 2006 U.S. Dist. LEXIS 82914, at *11 (E.D.N.Y. Mar. 9, 2006), *aff'd*, 220 Fed. App'x 59 (2d Cir. 2007) (summary order). Accordingly, Plaintiff's initial satisfactory review at La Guardia Houses does not cast doubt on the legitimacy of her subsequent unsatisfactory review or the six counseling memoranda that Plaintiff received at Isaacs Houses and Smith Houses. This is especially so, given that the unsatisfactory review and counseling memoranda were issued at different locations by different supervisors. *Johnson*, 2014 U.S. Dist. LEXIS 119158, at *9 ("That [Plaintiff] received better ratings from [her previous supervisors], under different circumstances, cannot result in an inference of discrimination against [Defendant].").

Plaintiff's disagreement with her supervisors' evaluations also does not raise an inference of discriminatory intent. *Risco v. McHugh*, 868 F. Supp. 2d 75, 104 (S.D.N.Y. 2012). "Mere 'disagreement with [an] employer's evaluation of [an employee's] performance is insufficient to establish discriminatory intent' because 'disagreements ... do not, as a matter of law or logic, mean that present poor performance reviews [are] unfounded.'" *Brenner v. New York City Dep't of Educ.*, 132 F. Supp. 3d 407, 418 (E.D.N.Y.) (citations omitted); *see also Miller v. NASD*, 703 F. Supp. 2d 230, 247 (E.D.N.Y. 2010) ("Plaintiff cannot [establish that a performance-based justification was not the actual justification] by stating [her] disagreement with [her] supervisors' negative assessment of [her] performance, 'even [if she] has evidence that the decision was objectively incorrect.'") (citations omitted).

Plaintiff also cites other alleged discriminatory treatment—including that she was forced to work alone in a dangerous building where she was sexually assaulted, denied a work coat and physical schedule, and subjected to derogatory and racist comments—as circumstantial evidence that her termination was racially motivated.  While these allegations are better analyzed under Plaintiff's hostile work environment claim, when considered here, they also fail to demonstrate that her termination was motivated by race- or gender-based discrimination because those allegedly responsible played no role in the decision to terminate Plaintiff.  Although Plaintiff cites Medina's email to Billini, referencing Chinese New Year and recommending that she be pay docked, as evidence of discriminatory animus, at best, this evidence shows that Medina harbored animus.  Medina, however, played no role in terminating, or recommending the termination of, Plaintiff.  Instead, Billini relied upon the three counseling memoranda issued at Smith Houses, one of which Billini issued, as well as her own observations of Plaintiff's poor performance and insubordination, and their negative impact on staff morale and Smith residents.

In sum, nothing in the record supports Plaintiff's claim that Defendant's conduct was motivated by race- or gender-based discrimination, or that Defendant's non-discriminatory reason for terminating Plaintiff was pretextual.  Because Plaintiff fails to raise a triable issue of fact to support a claim for wrongful termination under Title VII or Section 1981, Defendant is entitled to summary judgment as a matter of law.

### B. Hostile Work Environment under Title VII and Section 1981

#### 1. Legal Standard

Hostile work environment claims under Title VII and Section 1981 are analyzed according to the same principles.  *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015); *Terry v. Ashcroft*, 336 F.3d 128, 147 (2d Cir. 2003).  "A hostile work environment claim requires a

showing (1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (internal quotation marks omitted) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir.1997)).  "The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." *Id.*  The Second Circuit has "directed courts to determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998) (internal quotation marks omitted) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).  "[A] plaintiff alleging a hostile work environment must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted' to have altered the conditions of her working environment." *Alfano*, 294 F.3d at 374 (internal quotation marks omitted).

### 2. Application

Plaintiff cites four instances in which her supervisors or co-workers uttered racist and sexist slurs.  She also claims she was treated differently than her non-Asian co-workers because she was not issued a winter coat and forced to work outside; not given a work schedule at Isaacs Houses until her final days of working there; forced to work longer hours and perform more work; and denied time off to attend court appearances or threatened that she would be fired if she made such requests.  Based on all the evidence presented, and reviewing the record in the

light most favorable to Plaintiff, I am not persuaded that a reasonable person would view Plaintiff's work environment as sufficiently racially or sexually hostile so as to "alter the conditions of employment."

As to the racist and sexist slurs, while undoubtedly offensive if made, it is unclear whether four comments uttered over eight months renders hostility severe or pervasive. More importantly, however, Plaintiff fails to offer evidence that these comments unreasonably interfered with her job performance. *Faragher*, 524 U.S. at 787–88. To wit, in support of her discrimination claims, one of Plaintiff's chief complaints is that she was forced to work alone, and therefore, not around anyone, let alone her hostile co-workers or supervisor. I find it implausible that both allegations could be true simultaneously, or that the abhorrent stray comments of her supervisor or coworkers altered the conditions of her employment.

As to Plaintiff's other evidence of discriminatory treatment, much is contradicted by record evidence. For example, although Plaintiff claims that she was forced to work without a coat for long hours in the winter at La Guardia Houses, in fact, Plaintiff did not work at La Guardia Houses during the winter. She was transferred to Isaacs Houses in late November 2016, and to Smith Houses on January 10, 2017. She does not allege that she was denied a coat at either development, where she indisputably did work in winter.

Plaintiff also claims that she was forced to work longer hours than her non-Asian co-workers. However, Plaintiff's time sheets belie this assertion. In her opposition to the instant motion, Plaintiff endeavors to cast doubt on the veracity of these records stating that she "has no control over those records, which may not have documented overtime work." Opp., at 20. However, she offers no evidence to substantiate her assertions of nefariousness, and she cannot

19

avoid summary judgment "through mere speculation or conjecture." *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 831 (S.D.N.Y. 2013) (citation omitted).

Finally, Plaintiff claims she was denied leave to attend court hearings on various occasions. Plaintiff offers no evidence that any requests were denied; rather, the crux of her argument seems to be that she was dissuaded from making requests or prevented from doing so because her supervisors would not give her the necessary forms. While the absence of evidence can be persuasive and relevant in certain circumstances, this is not such a circumstance. Here, the record shows that Defendant approved eleven requests for time off. Rodriguez also testified that the forms were readily available in his office, and more importantly, that he could not deny a request to attend a court hearing. Plaintiff has not offered any evidence suggesting that had she properly submitted two further requests, that they would have been denied.

As to the remainder of Plaintiff's evidence, she either fails to show that it was racially or sexually motivated, or even if it was, that it was severe or pervasive. For example, Plaintiff claims that *one* day she was forced to go count windows in the rain, but this single instance of an inconvenient assignment is wholly insufficient. Plaintiff's characterizations of her supervisors or co-workers as "non-Asian" does not alter the analysis. The mere fact that Plaintiff is Chinese American, and that her supervisors and co-workers were not, does not establish that any unequal treatment was racially motivated.

Because Plaintiff has failed to raise a triable issue of fact as to her hostile work environment claim under either Title VII or Section 1981, Defendant is entitled to summary judgment as a matter of law.

### C. Retaliation Claims

#### 1. Legal Standard

Retaliation claims also are analyzed under the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the plaintiff must first establish a *prima facie* case of retaliation by showing that (1) he was engaged in protected activity; (2) the defendant was aware of the protected activity; (3) he suffered a materially adverse action; and (4) there is a causal connection between his protected activity and the material adverse action. *See Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012). "[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).

If the plaintiff establishes a *prima facie* case, then the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse action. *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). Once the employer offers such proof, the burden shifts back to the employee, who "must show that retaliation was a substantial reason for the adverse employment action." *Id.* At step three, the plaintiff must demonstrate "that the desire to retaliate was the but-for cause of the challenged employment action," and if she fails to do so, her claims are dismissed. *See Ya–Chen Chen v. City Univ. of New York*, 805 F.3d 59, 70, 73 (2d Cir. 2015).

#### 2. Application

I find that Plaintiff's retaliation claims fail at the threshold because she has not

established a causal relationship between her protected activity and termination.  Plaintiff claims

that she made both informal and formal complaints about discriminatory treatment, but neither

supports a claim for retaliation.

Plaintiff maintains that she (informally) complained verbally to her supervisors at

Isaacs Houses and Smith Houses, verbally to HR and her local congressperson at some time in

December 2016 and January 2017.  There is no evidence of any such complaints in the records.

And as to the complaints to HR, Altman testified that she did not know of Plaintiff before

February 2017 and learned of Plaintiff's allegations of discrimination only during their meeting

in March 2017.  But even assuming that Plaintiff did make the foregoing informal complaints,

they are too remote in time.  The materially adverse event (her termination) occurred four to five

months after she engaged in protected activity (reporting discrimination).

As to Plaintiff's formal complaint to the DEO in March 2017, while it technically

pre-dated her termination on May 12, 2017, the events giving rise to and supporting Plaintiff's

termination (her poor performance and insubordination) pre-dated her complaint.  Defendant

would have been within its rights to terminate Plaintiff prior to her engaging in protected

activity.  Neither Defendant's decision to wait, nor its refusal to transfer Plaintiff to Vladeck

Houses, renders her termination retaliatory.  By all accounts, Plaintiff brought her termination

upon herself, by refusing to accept any of the reasonable accommodations that Defendant

offered, failing to communicate how or why the alternative placements would be insufficient to

accommodate her status as a victim of domestic violence, and failing to communicate when she

would return to work.  *See Gubitosi v. Kapica*, 154 F.3d 30, 33 (2d Cir. 1998) (finding plaintiff's

misconduct, in between her protected activity and termination, constituted an intervening event

that defeated an inference of retaliation).  In short, Plaintiff has not provided even circumstantial

evidence establishing a "causal connection between [Plaintiff's] protected activity and the material adverse action."  *Lore*, 670 F.3d at 157.

Notwithstanding the foregoing, even assuming Plaintiff had established a prima facie case of retaliation, Defendant would still be entitled to summary judgment because it has articulated a legitimate non-discriminatory reason for its business decision, and Plaintiff has not adduced evidence to support a rational finding "that retaliation [rather than Plaintiff's poor performance and insubordination] was a substantial reason for the adverse employment action." *Jute*, 420 F.3d at 173.

Plaintiff fails to raise a triable issue of fact to support a claim for retaliation under Title VII or Section 1981.  Defendant is thus entitled to summary judgment as a matter of law.

\*   \*   \*

Because I grant the Defendant's motion for summary judgment as to Plaintiff's claims under federal law, I decline to exercise supplemental jurisdiction over her City-law claims, which comprise counts IV, V, and VI of the complaint.  *See* 28 U.S.C. § 1367(c)(3); *Klein & Co. Futures v. Bd. of Trade*, 464 F.3d 255, 262 (2d Cir. 2006) ("It is well settled that where . . . federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims.").

**CONCLUSION**

For the reasons described above, Defendant's motion for summary judgment on Plaintiff's claims under Title VII and Section 1981 is granted.  The argument scheduled for January 6, 2022 is canceled.  The Clerk shall enter judgment in favor of Defendant, terminate the motion (ECF No. 50), and mark the case closed.

SO ORDERED.

Dated:  January 3, 2022                           /s/ Alvin K. Hellerstein
        New York, New York                     ALVIN K. HELLERSTEIN
                                                United States District Judge