22-138-cv
Zeng v. N.Y.C. Hous. Auth.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 08/07/2023

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007 IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 17th day of July, two thousand twenty-three.

PRESENT: ROBERT D. SACK,
JOSEPH F. BIANCO,
EUNICE C. LEE,
        *Circuit Judges*.

------------------------------------------------------------

Xiamin Zeng, AKA Aimee Zane,

    *Plaintiff-Appellant*,

v.           22-138-cv

New York City Housing Authority,

    *Defendant-Appellee*.

------------------------------------------------------------

FOR PLAINTIFF-APPELLANT:    KENNETH F. MCCALLION, McCallion & Associates, LLP, New York, NY.

FOR DEFENDANT-APPELLEE:    HANH H. LE (Nancy M. Harnett, *on the brief*), *for* Lisa Bova-Hiatt, Executive Vice President for Legal Affairs and General Counsel, New York City Housing Authority, New York, NY.

MANDATE ISSUED ON 08/07/2023

Appeal from the United States District Court for the Southern District of New York (Hellerstein, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is hereby **VACATED**, and the action is **REMANDED** for further proceedings consistent with this order.

Plaintiff-appellant Xiamin Zeng ("Zeng") appeals from the January 4, 2022, judgment of the United States District Court for the Southern District of New York, granting summary judgment to the New York City Housing Authority ("NYCHA") on her federal claims and declining to exercise supplemental jurisdiction over her state law claims. Zeng was employed by NYCHA as a probationary Caretaker, performing janitorial services at three different NYCHA housing developments from July 28, 2016, until her termination on May 12, 2017. Zeng, who is a Chinese-American woman, alleged, *inter alia*, that NYCHA discriminated against her on account of her race, national origin, gender, familial status as a single parent, and status as a victim of domestic violence by subjecting her to a hostile work environment, and terminated her employment in retaliation for her reporting the discriminatory conduct to her supervisors, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.* ("NYCHRL"), and 42 U.S.C. § 1981 ("Section 1981"). We assume the parties' familiarity with the underlying facts and procedural history, to which we refer only as necessary to explain our decision.

We review *de novo* the grant of summary judgment. *Brooklyn Ctr. for Indep. of the Disabled v. Metro. Transp. Auth.*, 11 F.4th 55, 61 (2d Cir. 2021). Summary judgment is appropriate "only upon a showing 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir.

2012) (quoting Fed. R. Civ. P. 56(a)). When deciding a motion for summary judgment, we must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Id.* (internal quotation marks and citation omitted).

Zeng advances three principal arguments on appeal. First, she argues that the district court erred in concluding that despite evidence of repeated and extensive discriminatory remarks directed at her by her supervisors and co-workers, among other misconduct, summary judgment on the hostile work environment claims was warranted. Second, Zeng asserts that the district court similarly erred in granting summary judgment on the discriminatory termination claims because triable issues of fact existed as to whether NYCHA's stated non-discriminatory grounds were a pretext for Zeng's termination. Finally, with respect to the retaliation claims, Zeng contends that the district court erred in determining that the evidence in the record established that NYCHA's decision to terminate Zeng pre-dated her complaints of discriminatory conduct, and that, even assuming that a *prima facie* case of retaliation was established, NYCHA articulated legitimate non-discriminatory reasons for her termination that she failed to rebut with evidence of retaliation.

As an initial matter, we affirm the district court's dismissal of Zeng's claims under Title VII and Section 1981 to the extent that they are predicated upon her status as a single parent or a victim of domestic violence. *See* 42 U.S.C. § 2000e-2(a) (recognizing claims based on race, color, religion, sex, or national origin, but not familial status or status as victim of domestic violence); 42 U.S.C. § 1981; *see also Albert v. Carovano*, 851 F.2d 561, 572 (2d Cir. 1988) (en banc) ("Section 1981 was intended to combat racial or ethnic discrimination, nothing more.").[1]

---

[1] We note that, even though not separately actionable under these statutes, Zeng is permitted to rely upon evidence of her interactions with NYCHA regarding her marital issues and being the victim of domestic abuse to the extent such interactions are relevant to her Title VII and Section 1981 claims based on race and gender discrimination.

3

However, as set forth below, we conclude that the district court erred in granting summary judgment on Zeng's claims based on race and gender, as well as retaliation, under Title VII and Section 1981.[2] We conclude, construing the evidence in the record most favorably to Zeng, that there is sufficient evidence from which a reasonable jury could find that the alleged racial and sexist remarks directed at Zeng, combined with other conduct by co-workers and supervisors, cumulatively created a hostile work environment based on her race and/or gender. We also conclude that the district court erred in granting summary judgment on Zeng's discriminatory termination claims because disputed issues of material fact exist regarding whether NYCHA's stated reasons for terminating her were pretext for unlawful race and/or gender discrimination. Lastly, we similarly conclude that the evidence, including a supervisor's written request for Zeng's termination within weeks of her complaints of discriminatory conduct, as well as other evidence in the record supporting an inference of retaliation, precludes summary judgment on Zeng's retaliation claims.[3]

## I. Hostile Work Environment Claims

"[T]o survive summary judgment on a claim of hostile work environment harassment, a plaintiff must produce evidence that 'the workplace is permeated with "discriminatory intimidation, ridicule, and insult," that is "sufficiently severe or pervasive to alter the conditions

---

[2] We analyze Zeng's hostile work environment, discriminatory termination, and retaliation claims under Section 1981 utilizing the Title VII framework. *See Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 n.4 (2d Cir. 2014) (hostile work environment claims under Title VII and Section 1981); *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) (race discrimination claims under Title VII and Section 1981); *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (retaliation claims under Title VII and Section 1981).

[3] Because the district court declined to exercise supplemental jurisdiction over the NYCHRL claims and dismissed them without prejudice due solely to the absence of any remaining federal claims, we likewise vacate the dismissal of the NYCHRL claims. *See, e.g., Ramsy v. Marriott Int'l, Inc.*, 952 F.3d 379, 393 (2d Cir. 2020); *Karibian v. Columbia Univ.*, 14 F.3d 773, 781 (2d Cir. 1994).

4

of the victim's employment."'" *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)), *superseded on other grounds by*, N.Y.C. Local L. No. 85.  We may consider five non-exclusive factors in determining the existence of a hostile work environment:  "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a 'mere offensive utterance'; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted." *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 82 (2d Cir. 2009) (quoting *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999), *abrogated on other grounds*, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). "Our case law treats the first two of these factors—the frequency and the severity of the misconduct—as the principal focus of the analysis; the last three factors are specific considerations within the severity inquiry.  Core hostile work environment cases involve misconduct that is both frequent and severe, for example, when a supervisor utters blatant racial epithets on a regular if not constant basis and behaves in a physically threatening manner." *Id.* (internal quotation marks and citation omitted).  We have explained that an employer's motion for summary judgment must be denied "if the conduct there is *either* so severe *or* so pervasive as to alter the working conditions of a reasonable employee." *Richardson*, 180 F.3d at 440.  In addition, although "[i]solated incidents usually will not suffice to establish a hostile work environment, . . . we have often noted that even a single episode of harassment can establish a hostile work environment if the incident is sufficiently severe." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 175–76 (2d Cir. 2012) (internal quotation marks and citations omitted).  However, for "racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (internal quotation marks

5

and citation omitted). "Thus, whether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs, considered cumulatively in order to obtain a realistic view of the work environment." *Id.* at 110–11 (internal quotation marks and citations omitted).

Zeng asserts that the repeated incidents of abusive, discriminatory remarks and conduct by co-workers and supervisors, which occurred during her approximately ten months at NYCHA, were sufficiently severe and pervasive to support a hostile work environment claim. The district court determined otherwise, holding that "[b]ased on all the evidence presented . . . [the district court is] not persuaded that a reasonable person would view [Zeng's] work environment as sufficiently racially or sexually hostile so as to alter the conditions of employment." Special App'x at 18–19 (internal quotation marks omitted). We disagree with the district court and conclude that the evidence in the record, construed most favorably to Zeng, was sufficient to preclude summary judgment on the hostile work environment claims under Title VII and Section 1981.

Zeng submitted a sworn declaration and stated in her complaint that, in July 2016, when she began working at LaGuardia Houses as the only Asian employee for NYCHA at that location, her male supervisor (Alex Rodriguez) assigned her to work alone in a dangerous building, despite the fact that workers were usually assigned to work there in pairs for safety. In September 2016, Zeng was cornered by a resident of the building who threatened and sexually assaulted her. According to Zeng, although she reported the assault to NYCHA and requested a transfer to a safer location, there was no investigation or transfer, and instead she continued to be required to work alone on projects at LaGuardia Houses, unlike her male and non-Asian co-workers. Zeng also stated in her sworn declaration that she was forced to work outside without a coat for long hours during the cold month of November while NYCHA provided all other employees with winter

6

coats. Zeng further asserts that, in October 2016, she was denied time off to attend court appearances to renew an order of protection against her abusive ex-boyfriend, and her supervisor threatened to terminate her employment if she attended the hearing. Several weeks later, in November 2016, she was transferred to Isaacs Houses after she saw the man who had sexually assaulted her in September 2016 taking drugs near where she was working in LaGuardia Houses.

Zeng stated in her declaration and complaint that the alleged hostile work environment continued at Isaacs Houses based upon, *inter alia*, the following events: (1) on multiple occasions, her new male supervisor (Elliot Ramos) "kicked the unlockable women's bathroom door open and walked in while [she] was using the bathroom," asking whether she was sleeping or taking a break, App'x at 773; (2) for the majority of her placement at Isaacs Houses, Zeng did not receive a physical schedule setting forth her responsibilities on a weekly basis, even though her non-Asian co-workers received such a schedule, *id.*; *id.* at 62; and (3) in December 2016, while sitting with her co-workers and her then-supervisor Ramos, she told them that she would not work on Christmas Day because she had to facilitate a visitation with her son's father, and they responded by laughing and shouting racist and sexist comments, such as "f**king Asian," "f**king yellow Asian," "f**king stupid b***h," and "f**k her son," *id.* at 773.

After complaining about her mistreatment at Isaacs Houses, Zeng was transferred to Smith Houses in January 2017 and allegedly overheard her new supervisor (Elliott Medina) call her prior supervisor (Ramos) on her first day to ask for her personnel file, as to which Ramos angrily responded, "F**k the B***h! Do not transfer her! I'm her boss. She must be [at Isaacs Houses]! Give her a Memo. Kick her out. Stupid Yellow B***h!" *Id.* at 774. According to Zeng, one of her co-workers (Ms. Slim) from Isaacs Houses, who had cursed and laughed at her and said "F**k Asians" whenever she saw Zeng, also had been re-assigned to Smith Houses. *Id.* at 775. When

Slim learned of Zeng's transfer, Slim called several of Zeng's co-workers at Smith Houses who subsequently, on many occasions, shouted insulting words to Zeng in the women's restroom.

Here, "[t]aking the evidence in the light most favorable to [Zeng] and accepting her version of the events as true, as we are required to do and a jury would be permitted to do," *Redd*, 678 F.3d at 178, this evidence was sufficient to create a genuine issue of fact as to whether the alleged racist and sexist insults leveled against by her supervisors and co-workers, combined with the aforementioned conduct—including her male supervisor's physical invasion of her privacy in the women's restroom on multiple occasions—could lead a reasonable jury to conclude that Zeng was subjected to a hostile work environment based on her race and gender.

In reaching the opposite conclusion, the district court made unwarranted credibility determinations regarding the evidence. For instance, because Zeng claimed both that she was forced to work alone and that she was harassed by her co-workers and supervisors, the district court found that it was "implausible that both allegations could be true simultaneously." Special App'x at 19. However, there is nothing in the record to suggest that, although Zeng alleges that she was assigned to work alone in the dangerous building, she did not interact with her co-workers and supervisor at other times during the workday, such as during breaks and meetings. In fact, Zeng alleges that the racist and sexist insults in December 2016 occurred with other co-workers in the dining room. Similarly, the district court found that Zeng's allegation in the complaint about being forced to work outside for "long hours during the winter" at LaGuardia Houses without workcoats, App'x at 60, was contradicted by the record because she was transferred out of LaGuardia Houses in November 2016 and, thus, did not work there during the *winter*, Special App'x at 19. That improper credibility assessment, however, did not allow for the possibility that Zeng was colloquially referring to "winter" as also including cold days in late autumn when a

8

jacket was necessary. Indeed, in her declaration, Zeng specifically refers to her supervisors forcing her "to work long hours during a cold *November*." App'x at 772 (emphasis added). Furthermore, in rejecting Zeng's claim that she was denied leave forms by her supervisor, the district court appears to have credited the testimony given by Zeng's supervisor that the leave forms in question were "readily available in his office, and more importantly, that he could not deny a request to attend a court hearing." Special App'x at 20. Moreover, the district court did not address evidence Zeng submitted of a recording which, construed most favorably to Zeng, created a disputed issue of fact as to whether the supervisor repeatedly denied her request for a particular leave form. In short, these credibility determinations regarding Zeng's sworn statements, as compared to other evidence in the record, should have been reserved for the jury. *See, e.g.*, *Eichelberg v. Nat'l R.R. Passenger Corp.*, 57 F.3d 1179, 1186 (2d Cir. 1995) ("[C]redibility determinations are within the province of the jury and may not be resolved on a motion for summary judgment."); *see also Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010) ("[A]s a general rule, a district court may not discredit a witness's deposition testimony on a motion for summary judgment, because the assessment of a witness's credibility is a function reserved for the jury.").

Finally, in limiting Zeng's hostile work environment claim to "four instances in which her supervisors or co-workers uttered racist and sexist slurs," Special App'x at 18, the district court did not consider that Zeng's sworn statements which suggest that those instances were illustrations of insults that occurred on a more frequent basis. *See, e.g.*, App'x at 775 (alleging that Ms. Slim stated "F**k Asians" whenever she saw Zeng at Isaacs Houses, and that Zeng's female colleagues at Smith Houses "called Ms. Slim in front of [Zeng] many times and they shouted insulting words to [Zeng] in the women's restroom"). The district court also failed to consider the other alleged harassing conduct beyond the racist and sexist insults, such as her male supervisor (Ramos)

9

entering the women's restroom on multiple occasions, while she was using it, to question her about her work performance.

Accordingly, because the evidence was sufficient to create a triable issue of fact as to whether Zeng was subjected to a hostile work environment based on race and gender, the district court erred in granting summary judgment for NYCHA on those claims under Title VII and Section 1981.

## II.    Discriminatory Termination and Retaliation Claims

We further conclude that the district court erred in granting summary judgment on Zeng's discriminatory termination and retaliation claims, which we analyze pursuant to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (analyzing Title VII and retaliation claims together under the *McDonnell Douglas* burden-shifting standard).

Under Title VII, "[t]o state a prima facie case of race discrimination, a plaintiff must proffer evidence that (1) [s]he belongs to a protected group; (2) [s]he was qualified for [her] position; (3) [her] employer took an adverse action against [her]; and (4) the adverse action occurred in circumstances giving rise to an inference of race discrimination." *Id.* (citing *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)). "To state a prima facie case of retaliation under Title VII, a plaintiff must proffer evidence that [she] engaged in a protected activity, such as complaining about race discrimination, and that [her] employer took an adverse action in retaliation." *Id.* (citing *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010)).

"Once an employee makes a prima facie case of either discrimination or retaliation, the burden shifts to the employer to give a legitimate, non-discriminatory reason for its actions." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802). "If the employer does so, the burden then shifts

10

back to the plaintiff to show that the employer's explanation is a pretext for race discrimination or retaliation." *Id.* "With respect to a discrimination claim, 'once the employer has made a showing of a neutral reason for the complained of action, to defeat summary judgment the employee's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the employer's employment decision was more likely than not based in whole or in part on discrimination.'" *Id.* (alterations adopted) (quoting *Terry*, 336 F.3d at 138). "With respect to a retaliation claim, the employee's admissible evidence must show 'that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Id.* (quoting *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 835 (2d Cir. 2013)).

On appeal, NYCHA does not argue that Zeng failed to establish a prima facie case of race- or gender-based discrimination. Instead, NYCHA urges us to uphold the district court's determination that NYCHA had adequately rebutted Zeng's prima facie case by articulating legitimate, non-discriminatory reasons for terminating her employment—premised, primarily, on poor performance and insubordination—and that Zeng failed to proffer sufficient evidence of pretext to rebut these non-discriminatory grounds for termination. We are unpersuaded.

On the record before us, there is sufficient evidence that, if credited, could rationally support a jury's finding that NYCHA's termination of Zeng was a pretext for unlawful race discrimination and/or retaliation. The evidence in the record, construed most favorably to Zeng, includes the following:

- On December 21, 2016, Ramos, Zeng's supervisor at Isaac Houses, issued her a disciplinary memorandum for misplacing her keys but did not penalize other employees who also lost their keys. When Zeng reported Ramos for this discriminatory conduct, he threatened to fire her.

11

- Several days later, on December 23, 2016, Ramos and other employees made a number of racist and sexist comments at Zeng after she informed them that she did not want to work overtime on Christmas Day because she had to facilitate a child custody visit on that day. Zeng again complained about Ramos's discriminatory treatment to Russell Hartfield, another supervisor, but that supervisor did nothing. Then, on December 28 and 30, 2016, Zeng was issued negative memoranda about her work, and she later learned that Ramos and Hartfield had issued a negative evaluation.

- After filing a telephonic complaint with Human Resources about her treatment at Isaac Houses, Zeng was transferred to Smith Houses on January 10, 2017. There, Elliott Medina, Zeng's new supervisor, asked her to come to the management office, where she overheard him speaking on the telephone with Ramos regarding the transfer of her personnel files to Smith Houses. In her sworn declaration, as noted *supra*, Zeng proffered that she overheard Ramos get angry and yell racist and sexist comments regarding Zeng and also tell Medina that Zeng should be disciplined and terminated.

- On January 31, 2017, Zeng emailed Medina to inform him that she was unable to attend work because of menstrual pains and that she would be using two sick days. Medina then sent that email to Superintendent Liliana Billini and Ivonne Cunningham, writing, "Look at this Billini! It [sic] Chinese new year. Ivy pay dock her." App'x at 734.

- On February 3, 2017, Zeng emailed Deborah Altman in the Human Resources Department to apply for a transfer to another location. Although the documentary

12

evidence shows that Zeng made this request out of a concern for her physical safety due to her belief that her ex-partner, whom she claims was abusive to her, discovered that she had been working at Smith Houses, Zeng later proffered, in a sworn declaration, that she had made that request after being subjected to the foregoing discriminatory conduct. She also stated that, on her last day at Smith Houses, three supervisors gave her three disciplinary memoranda, the contents of which she claims were largely false.

- In a letter dated February 6, 2017, Billini recommended to the Borough Director that Zeng be "[i]mmediately [t]erminated due to repeated memo issuance, being insubordinate to her supervisors, poor janitorial work performance and creating a hostile work environment." App'x at 222.
- On February 7, 2017, Zeng was placed on an unpaid leave of absence until such time that an alternative suitable worksite location could be found, and, after discussions regarding a potential transfer to a different NYCHA location failed, Zeng was terminated on May 12, 2017.

NYCHA argues that Zeng cannot rely upon the alleged discrimination that occurred at LaGuardia Houses and Issacs Houses to demonstrate pretext because her supervisors at those locations did not recommend her termination; rather, the request for termination was made at Smith Houses by Billini, who was not alleged to have displayed any animus. However, that contention overlooks the fact that Billini's memorandum requesting termination was based not only on events at Smith Houses, but also noted "repeated memo issuance," App'x 222, which one could reasonably infer was a reference to prior counseling memos at other NYCHA sites—including three such memos at Isaacs Houses written by Ramos, whom Zeng alleges used racial and sexist

13

epithets against her.[4]  Moreover, Ramos allegedly conveyed his racial and retaliatory animus in Zeng's presence to Medina, her supervisor at Smith Houses, who allegedly also harbored racial animus and wrote counseling memos for insubordination and poor performance.  As we have explained, the "cat's paw" theory of liability imputes a discriminatory motive to a decisionmaker where such action is proximately caused by the animus of a subordinate—that is, "the supervisor, acting as agent of the employer, has permitted himself to be used as the conduit of the subordinate's prejudice." *Vasquez v. Express Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016) (alteration adopted) (internal quotation marks and citation omitted).  Thus, on this record, the alleged discriminatory animus of Ramos and Medina supports the existence of a disputed issue of material fact as to whether the reasons underlying Billini's termination request, including prior counseling memos by Ramos and Medina, were pretext for discrimination and/or retaliation.

In addition, with respect to retaliation, we disagree with the district court's determination that those claims "fail at the threshold because she has not established a causal relationship between her protected activity and termination." Special App'x at 21–22.  The district court principally focused on the timing between when Zeng allegedly first complained about the discrimination (December 2016 or January 2017) and the formal date of her termination (May 12, 2017), which it held was "too remote in time" to allow an inference of causation. *Id.* at 22.  As a threshold matter, although the "causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action," *Cifra v. G.E. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (internal quotation marks and citation omitted), this Court "has not drawn a bright line to define the outer limits beyond which a

---

[4] NYCHA contends that Billini was referencing only counseling memos at Smith Houses.  However, the ambiguous record permits more than one reasonable inference, including the one Zeng seeks to draw.

14

temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001); *see also Hubbard v. Total Commc'ns, Inc.*, 347 F. App'x 679, 681 (2d Cir. 2009) (summary order) (holding that four months was not too remote in time to establish a causal relationship). In any event, the district court's exclusive focus on the formal date of termination failed to consider the undisputed evidence, as discussed *supra*, that Billini first recommended Zeng's immediate termination on February 6, 2017, only weeks after she purportedly complained about the discriminatory conduct. Under these circumstances, the fact that the formal termination did not occur until several months later does not undermine a reasonable inference of causation that could be drawn from the close proximity between the alleged complaint of discrimination and the initial request for termination.[5] *See Sassaman v. Gamache*, 566 F.3d 307, 312 (2d Cir. 2009) (explaining that "an inference of discriminatory intent may be established by, *inter alia* . . . the sequence of events leading to the plaintiff's discharge." (internal quotation marks and citations omitted)). Moreover, the district court failed to consider that Zeng also sought to establish a retaliatory motive by relying more directly on the alleged instruction by Ramos to Medina, after Zeng had been transferred to Smith Houses, to "[g]ive her a Memo" and "[k]ick her out." App'x at 774.

---

[5] NYCHA argues that, between the request for termination and the actual termination, there were good faith efforts by NYCHA to attempt to transfer Zeng to Rutgers Houses or developments in the Bronx and Staten Island, but Zeng rejected any such alternatives. However, Zeng contends that those efforts were intended to cover up their pretextual reasons for termination. For example, in a March 2017 email chain about a vacancy in Rutgers Houses, the Deputy Assistant Director of Human Resources wrote, "I thought I had deleted the bulk of questionable comments from the email chain. However, [I] will oblige your request." App'x at 743. In short, the events following the request for termination also contain factual disputes that cannot be resolved on summary judgment.

15

In sum, Zeng's sworn declaration, combined with the other evidence in the record, is sufficient to raise a genuine issue of material fact as to whether NYCHA's non-discriminatory grounds for termination were pretext for discrimination and/or retaliation. Of course, a "jury might credit all of this proffered evidence, some of it, or none at all. But that is left for the jury to decide at trial." *Kirkland*, 760 F.3d at 227 (internal quotation marks and citation omitted).

Accordingly, the district court erred in granting NYCHA's motion for summary judgment on Zeng's discriminatory termination and retaliation claims under Title VII and Section 1981.

\*         \*         \*

We have reviewed NYCHA's remaining arguments and conclude that they are without merit. For the foregoing reasons, we **VACATE** the judgment of the district court and **REMAND** the action for further proceedings consistent with this order.

FOR THE COURT:<br>
Catherine O'Hagan Wolfe, Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

16